*In re* MI-JACK PRODUCTS, INC. (Mi-Jack Products, Inc., Plaintiff-Appellant, v. The Department of Revenue, Defendant-Appellee).

First District (4th Division)   No. 84—1552

Opinion filed September 12, 1985.

John L. Swartz, of Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, P.C., of Springfield, and S. Ira Miller, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Rita M. Novak, Assistant Attorney General, of counsel), for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Mi-Jack Products, Inc., on December 23, 1980, filed a

claim for refund with the defendant, Illinois Department of Revenue (hereinafter the Department), for Retailers' Occupation Taxes paid in connection with the sale of two cranes. The plaintiff claimed that the sale was subject to an exemption of rolling stock moving in interstate commerce. (See Ill. Rev. Stat. 1979, ch. 120, par. 441.) After the hearing, the Department denied plaintiff's claim. The circuit court affirmed. The plaintiff now appeals. The sole issue on review is whether, as a matter of law, the two cranes sold in the instant case are included under the rolling stock exemption of the Illinois and Municipal Retailers' Occupation Tax Acts.

On May 20, 1977, Mi-Jack Products, Inc., an Illinois corporation in the business of selling piggy-back construction equipment, machine lift cranes and excavators sold and delivered to Pennsylvania Truck Lines, Inc. (PTL), two Drott Travel-lift cranes for the amount of $553,000 plus $27,650 in Illinois and Municipal Retailers' Occupation taxes. Mi-Jack issued an unconditional and irrevocable credit to PTL for the amount of the tax and then sought a refund from the Department. As a result of excluding from the tax down payments made, Mi-Jack ultimately was seeking a refund in the amount of $22,120.

A Drott Travel-lift crane is a self-propelled, diesel powered vehicle mounted on rubber tires and used to lift trailers and containers on and off railroad cars. The crane does not run on the railroad track, but rather straddles the track as it travels the length of the train. The crane is capable of free movement and operates all around the railroad yard wherever the ground will support it. The crane is equipped with an overhead conveyor which enables it to lift the containers off the train, place them along the road adjacent to the track to be picked up by a tractor and hauled over the highway or picked up and placed on another railroad flat car.

In addition to the overhead method employed by the instant cranes, there are two other methods available for performing the function of transferring trailers and containers to and from trains or sending them on the highways. One is the circus ramp method, which requires a truck tractor to be backed on the train to be connected with the trailer and then removed from the train. This method requires 30-60 minutes per operation. The second method is the side-loading operation. By this method, the trailer is picked up from the side of the train, loaded on the flat car, and secured. This procedure takes approximately two minutes. The instant crane performs each operation in approximately 90 seconds.

The purchaser, PTL, is an interstate carrier, operating under a certificate issued by the Interstate Commerce Commission. The company

is a subsidiary of Consolidated Railway and is engaged in the business of transporting goods and trailers for other companies. All of the transfers made by the instant cranes involved goods that are moving in interstate commerce.

On August 22, 1983, the Department issued its final determination denying plaintiff's claim for a refund. In her recommendation to deny, the hearing officer found that although the cranes were necessary for the efficient transportation of goods and that the trailers moved by the cranes travelled in interstate commerce, the cranes themselves were not rolling stock. Her conclusion was based on her findings that although the cranes were movable devices, the movement was confined to travelling the length of the train. Moreover, she found that the cranes could not be considered attachments or usual accompaniments to rail flat cars or trailers since they did not travel with the train, were not attached to trailers or railroad cars and were not necessary for the accomplishment of the usual purpose of either flat cars or trailers.

In its capacity under the Administrative Review Act, the circuit court ruled that the hearing officer correctly excluded the cranes from the rolling stock exemption. This appeal then ensued.

On appeal, Mi-Jack contends that the Drott Travel-lift crane has a function in interstate commerce as an essential component to the intermodal system of transportation, a system that combines railway travel with travel via the highway. Based on that function Mi-Jack contends that the cranes are included under the rolling stock exemption of the Retailers' Occupation Tax Act.

The Retailers' Occupation Tax Act imposes a tax upon "persons engaged in the business of selling tangible personal property at retail *** excluding, however, *** the proceeds from sale of tangible, personal property to interstate carriers for hire for use as rolling stock moving in interstate commerce ***." (See Ill. Rev. Stat. 1979, ch. 120, par. 441(c); Ill. Rev. Stat. 1979, ch. 24, par. 8—11.1.) The regulation interpreting this statute provides:

> "The term 'Rolling Stock' includes the transportation vehicles of any kind of interstate transportation company for hire (railroad, bus line, airline, trucking company, etc.), *** Railroad 'rolling stock' includes all railroad cars, passenger and freight and locomotives (including switching locomotives) or mobile power units of every nature for moving such cars, operating on railroad tracks and includes all property purchased for the purpose of being attached to such cars or locomotives as a part there-of. Exemption includes some equipment (such as containers called trailers) which are used by interstate carriers for hire, loaded on

railroad cars, to transport property, but which do not operate under their own power and are not actually attached to the railroad cars."

A person claiming an exemption from taxation has the burden of proving clearly that he comes within the statutory exemption. Such exemptions are to be strictly construed, and doubts concerning the applicability of the exemptions will be resolved in favor of taxation. (*United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 419 N.E.2d 899.) Every presumption is against the intention to exempt property from taxation. *Follett's Illinois Book & Supply Store, Inc. v. Isaacs* (1963), 27 Ill. 2d 600, 190 N.E.2d 324.

In the case at bar, Mi-Jack argues, based on *Burlington Northern, Inc. v. Department of Revenue* (1975), 32 Ill. App. 3d 166, 336 N.E.2d 170, a case in which this court held that switch engines were subject to a similar rolling stock exemption under the Use Tax Act (see Ill. Rev. Stat. 1971, ch. 120, par. 439.3(b)), that the instant cranes are the "switch engines of the intermodal system" and that therefore they also qualify as rolling stock. Mi-Jack argues that the court in *Burlington Northern* recognized the integral part switch engines played in the modern railway system and that it was not critical that the switch engines themselves were not property that actually moved in interstate commerce.

In *Burlington Northern*, the court determined that switch engines, commuter cars, trailers and containers were all considered rolling stock moving in interstate commerce. However, the direct question the court had to decide with regard to switch engines was whether switching operations conducted wholly within one State could be considered to be "moving [in] interstate commerce" when the cars and engines switched were moving in interstate commerce. (*Burlington Northern, Inc. v. Department of Revenue* (1975), 32 Ill. App. 3d 166, 178-79, 336 N.E.2d 170.) Thus, it appears that the court never actually questioned whether the switch engines themselves were railroad rolling stock, but rather only whether they could be considered to be "moving in interstate commerce."

Where the court in *Burlington Northern* did get into a discussion with regard to the definition of rolling stock was in its consideration of containers and trailers. There, the plaintiff contended that the containers and trailers that were placed upon flat cars and sent into railway traffic were instrumentalities of interstate commerce and as such were part of the rolling stock of railroad. However, the defendant, the Department of Revenue, contended that containers and trailers were not rolling stock since they were "not permanently affixed" to cars or loco-

motives.

In considering whether the containers and trailers were rolling stock, the court in *Burlington Northern* noted that in light of the lack of legislative intent and the scarce judicial interpretation, it would rely principally upon the language of the statute as interpreted by the Department of Revenue in its regulations. The court in *Burlington Northern* focused heavily on the fact that containers and trailers were essential instrumentalities of railroad transportation and that since " '*** railroad "rolling stock" includes all railroad cars *** and includes all property temporarily stored for the purpose of being permanently attached to such cars *** as an integral part thereof,' " it concluded that the language of the regulation was broad enough to include containers and trailers. *Burlington Northern, Inc. v. Department of Revenue* (1975), 32 Ill. App. 3d 166, 181, 336 N.E.2d 170.

In the instant case, the language of the regulation discussing the Retailers' Occupation Tax Act rolling stock exemption nearly parallels that of the regulation in *Burlington Northern*. The instant regulation has however adopted the holding in *Burlington Northern* by specifically including switch engines, containers and trailers in its language. As was noted in *Burlington Northern*, because there is a lack of legislative intent and judicial interpretation as to what the considerations are in determining whether particular property is rolling stock, this court will look to the statute and its interpretation by the Department of Revenue's regulation.

The scheme of the regulation provides a very general definition of rolling stock; the transportation vehicles of any kind of interstate transportation company for hire (including a railroad and a trucking company). It then provides a more detailed definition of railroad rolling stock: "Railroad 'rolling stock' includes all railroad cars, passenger and freight, and locomotives (including switching locomotives) or mobile power units of every nature for moving such cars, operating on railroad tracks and includes all property purchased for the purpose of being attached to such cars or locomotives as a part there-of. The exemption includes some equipment (such as containers called trailers) which are used by interstate carriers for hire, loaded on railroad cars, to transport property, but which do not operate under their own power and are not actually attached to the railroad cars."

It appears that the court in *Burlington Northern* made a determination that switch engines, containers and trailers were rolling stock pursuant to the regulation's definition of railroad rolling stock. In the instant case, the cranes share none of the properties of railroad rolling stock. These cranes are not railroad cars or locomotives, they do not

operate on railroad tracks and are not attached to such cars or locomotives as a part thereof. Further, these cranes do not qualify as equipment such as containers and trailers. These cranes are not loaded on railroad cars. Accordingly, as interpreted by the regulation, it is clear that the cranes do not qualify for an exemption as railroad rolling stock.

However, even though they are not railroad rolling stock, we must also consider whether the instant cranes meet the general definition of rolling stock as provided by the regulation. This definition only provides that the transportation vehicles of interstate transportation companies for hire qualify. There is no contention that the instant cranes are not associated with an interstate transportation company for hire. Rather, the key to our determination is establishing what is meant by "transportation vehicles."

This court is inclined to believe that the ordinary meaning of these words, "transportation vehicles," describes vehicles that transport goods or people between two locations. The instant cranes do not actually transport goods, but rather only transfer them. If we were to include these cranes under the rolling stock exemption, we would also have to include forklifts, since forklifts are also moving vehicles which can facilitate the process of interstate commerce by transferring goods from one truck to another. We do not believe that the statute and its regulations intended to include vehicles of this nature in its exemption. Accordingly, given the principle of law that tax exemptions are to be strictly interpreted and that doubts concerning the applicability of the exemptions are to be resolved in favor of taxation (*United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 419 N.E.2d 899), we therefore conclude that the instant cranes are not included in the rolling stock exemption.

However, Mi-Jack also argues that given the General Assembly's failure to restrict the statute, it is therefore incumbent upon this court to provide a broad interpretation of the statute and regulation as was evidenced in *Burlington Northern.* We believe that we sufficiently considered the language of the statute and regulation and rendered an interpretation consistent with their intent and with the decision in *Burlington Northern.*

Therefore, based on the foregoing, we affirm the judgment of the trial court.

Judgment affirmed.

JOHNSON and LINN, JJ., concur.